Case Numbers 22-5542, 22-5543, 22-5544 Kesha Gray v. Shelby County TN Argument not to exceed 20 minutes per side. Ms. Rasool and Mr. Greer, you may proceed with the appellants. Good morning, Your Honors. May it please the Court. My name is Danielle Rasool and I'm arguing on behalf of Appellant Barnett this morning. My co-counsel Aubrey Greer will be arguing on behalf of Appellants Simonson and Sumner. We reserve 2 minutes of rebuttal time with 11 minutes of the total time for my argument and 7 minutes for Mr. Greer's argument. I apologize as the presiding judge for the late notice about how it's going to be structured. It's totally fine. We were prepared for any curveballs. Barnett appeals the District Court's partial denial of his motion for summary judgment and qualified immunity application on Gray's remaining claims of unreasonable seizure, false arrest, and excessive force. Gray failed to satisfy her burden of proof at the lower court and Barnett is entitled to qualified immunity. This court should reverse the lower court's ruling. In my argument today, I plan to address the following three topics. First, Gray's failure to satisfy her burden of proof, specifically by failing to meet the clearly established prong. Because of her inability to point to a case that is directly on point or factually similar to the circumstances that would have put Barnett on notice in these circumstances, that his conduct violated her clearly established rights. This is fatal and entitles Barnett to qualified immunity. We have a case, Swafford, does that ring a bell? The 1989 case that says material witnesses are subject to arrest and detention under appropriate circumstances. I know that's a general formulation, but does that ring a bell? Yes, your honor. At the lower court, we did bring up the material witness statute as well, alleging that Gray was a material witness. The district court did not take that argument well, stating that the statute was related to bond issues. But in this case, she was potentially a material witness as different officers or different law enforcement officers understood through the communication in the chain of command. There may have been some miscommunication. Here, it was known that she, or it was believed that she was a victim of domestic violence that occurred in public. The third party witness that called in the alleged domestic violence reported that he was approached by the individual aggressively and pulled a firearm on him. This was relayed to officers in the chain of command and it was believed there was also another incident. Any questions of fact about that? I thought there was some record that there were some correct communications, which is that the person who called it in is the one who pulled the gun. Yes, that's correct. That was reported, and you can hear that in the videos and the recordings. Deputy Barnett relayed that information to his supervisor, Sergeant Simonson, or Sumner, I believe, and Sumner, in turn, spoke with Simonson. During this communication, it's possible that she misunderstood. It's possible, you're right, but there are questions of fact about that. Do you concede that? No, Your Honor, I do not. On appeal, we avoided that issue. We concede to the factual findings of the lower court because we are purely sticking to the legal analysis here. That being that Gray was suspected of being a witness and a victim, a witness being a witness to her own domestic violence incident. She was the only individual available to provide any information as to herself and the purported suspect who was abusing her in the middle of the road. I didn't interrupt your question, did I? Go ahead. Are there no limitations under extant law in this circuit on the authority of a police officer to use force to detain a material witness who herself is not suspected of any wrongdoing? Of course, there are limitations, and that goes to the Fourth Amendment analysis of reasonableness. And when we move to that, looking at the situation at hand, so witnesses... She's just trying to walk home. She is trying... And obviously, she doesn't want to talk to the guy. And so, I mean, what is there... I know that they have to show that what he did was unlawful, you know, clearly, under established law. But, I mean, where is the law that says he can start this sequence of force where he grabs her wrist? And somebody who just wants to go home after, you know, upsetting incident may have a strong reaction to that. I mean, what gives him the right to start that? Yes, and that's a valid question and concern, Your Honor. Here, the burden is on plaintiff to prove that it was clearly established that he violated her rights in this situation. It's not Barnett's burden to prove... I know that. I know. I believe that. I fully understand that. But, I mean, is there any case law that you think, you know, maybe looking at the first prong of lawfulness in the first place, is there any case law that, in your view, actually suggests that what happened here was lawful? Or is that probably not, you know, is it probably not lawful? Yes, Your Honor. There is case law that I believe suggests that Barnett's conduct here was lawful. There are many instances... Do you have a case in mind? Yes. In Lincoln v. Turner, which is a Fifth Circuit case, and it's cited in our brief, there was a witness who was detained because of a shooting. And there, the court held that it was not clearly established that a cop needed probable cause to detain a witness, and he received qualified immunity on the unreasonable seizure claim. However, the secondary holding was that it was clearly established that the force used to detain the witness was not excessive force. What's the limitation of what the officer could have done? He could stop the lady, and then he could make her get in a police car? Yes, Your... He could go to jail? Your Honor, so the intention was to temporarily detain her, which was never actually completed to succession before she started committing crimes in front of Barnett. Trying to get loose from him, wasn't she? Yes, that's correct. As can be seen in the videos, the moment in time that this ruling is focused on is two seconds, and that is when Barnett reaches for her wrist with his hand and handcuffs drawn. She twists away, and she runs into the road. He continues to follow her, and then after maybe a few minutes, he again tries to grab her to put handcuffs on her. The two-second moment was when the district court said this was the unreasonable seizure, this was a false arrest, this was excessive force. But you can't be seized if you're never constrained. He's using force. I mean, we're semantics really here. Doesn't the case law say that it doesn't have to be successful? There's case law that says it doesn't have to be successful. There's also case law that says one is not seized until he is subdued or stopped. In this situation, the force that was used was just a touch to the wrist, a grasp of the wrist. And if you look at the video, it's de minimis. But I just don't think this is going to be a helpful line, to be honest. I mean, he slams her to the ground eventually. And I know it's a sequence, but the idea that there was no seizure relevant to our analysis here just doesn't seem to be right. Your Honor, that portion of the encounter is not on appeal. That portion was after she had committed numerous violations of the law, and the court found that there was probable cause at that point in time to arrest her, and also that the force used in that situation was not excessive force because she was physically resisting. She was hitting at the officers. She was flailing about in the middle of the road. She posed a danger to herself, the officers, and other drivers. I mean, I think in the limited time we have, we ought to assume that there was a seizure and just kind of argue from there. And, you know, I'm not foreclosing questions. And even assuming there is a seizure here and that it was an unreasonable seizure, a constitutional violation of her rights, it does not follow that automatically Barnett is not entitled to qualified immunity. Gray still has to find a case similar to these circumstances because this is a situation that's so unique. Are you arguing that any victim of domestic assault can be arrested because they're a witness? No, Your Honor. I am not arguing that a witness or victim of domestic assault can be arrested for any reason. In this moment, he was trying to detain her to obtain just purely her identifying information for this mandatory reporting requirement, and he also received orders from his superiors to do so. Okay, but let's say he did arrest her. I mean, it's not about the reason. He had a, you know, maybe he had a good reason. But, I mean, why isn't the answer to Judge White's question yes on your view of the law? I see my time. It's okay. May I answer? Yeah, sure. Yeah. I mean, why isn't the answer yes? They're always going to have a purpose like the one you just mentioned. There needs to be probable cause to arrest. Okay, so you agree with that? Yes. Yes, Your Honor. Okay, and when this sequence starts, he doesn't have probable cause to arrest Ms. Gray, right? That's correct. When does this seizure become an arrest? The seizure becomes an arrest after she starts committing these violations in front of the officers. Once the other deputies, the sergeant, arrive to the scene, they start to discuss what happened and what charges to bring. It was a quick sequence of events. Okay, but if he doesn't have probable cause to arrest her and he's trying to arrest her, how is it so unlawful for her to try not to be arrested unlawfully? The distinction is that he was attempting to temporarily detain her for the purpose, the stated purpose of obtaining her identifying information. He's trying to put handcuffs on her. Yes. I mean, that's a seizure all day long. Yes, but that's not. Trying to put handcuffs on somebody. He's trying to seize her. He does not have probable cause to seize her. I mean, arrest, seizure, same thing under the Fourth Amendment. He does not have probable cause to arrest her, but he did have the authority to temporarily detain her so long as that detention is reasonable in scope and duration. But we're walking together, right? I mean, he's with her. He's having these conversations. She declined to give him her, well, he kept asking for her identification and she said she didn't have it, but she declined to give him the information he wanted. Are you saying she can be arrested for that? No, Your Honor.  and further speak with supervisors on how to proceed in the situation. If she repeatedly refused to provide this information, then they would release her. But that's where they were. Isn't that where they were? She made it abundantly clear that she did not have any information to give him. She didn't have her ID. She didn't want to engage with him. And the case is saying she had a right to walk away. Yes. And under the circumstances here, with the Tennessee statute at play, the mandatory report that Barnett was required to prepare, it states he's required to prepare a complete report. His training instructs him that he needs to obtain the identities of individuals for this report. And the General Assembly, in enacting this statute, had very good reasons to do so. But that statute's not going to override the Fourth Amendment. Go ahead. And you'll have your rebuttal. No, it's all right. Do you have any more? No, no, no. Judge Saller? Okay, thanks. You'll have your rebuttal. We'll hear from your co-counsel. Thank you, Your Honor. Judge Saller, Judge White, Judge Kethledge, good morning and may it please the Court. My name is Aubrey Greer with the law firm of Glencla Brown in Memphis, Tennessee. As Ms. Russell told you, I, along with my co-counsel, represent the defendant appellants in these related cases today. I'll be addressing the Court on behalf of Sergeant Sumner and Sergeant Simonson for the purposes of appeal. The district court's decisions to deny their motions for summary judgment should be reversed for three basic reasons. First and foremost, Ms. Gray failed to respond to the motions for summary judgment at all. Second, both Sergeant Sumner and Sergeant Simonson are entitled to qualified immunity in any event. And third, the district court failed to do the sort of particularized, individualized analysis that's necessary in these types of qualified immunity cases. Now, you know that we can affirm on any basis a court by the record. Absolutely. So, I mean, personally, I think it might be helpful to talk mostly about the merits rather than all this procedural stuff about who said what in briefs. Absolutely, Your Honor. As to the substance of it, What exactly did your clients do? Were they just giving advice over the telephone or were they on the scene? Deputy Barnett was the officer that was on the scene that was dealing with Ms. Gray. Deputy Barnett called Sergeant Sumner, who is his shift supervisor. She's about 15 miles away at a precinct. She oversees about 20 to 25 officers on a daily basis. Deputy Barnett calls her and relays what he is seeing on the ground. Sergeant Sumner says to Deputy Barnett, Hold on, I'm going to call the General Investigative Bureau. It's the detective bureau for Shelby County Sheriffs. I'm going to get some guidance. Sergeant Sumner then calls the head of GIB that day. His name is Sergeant Simonson. Sergeant Sumner relays what she thought was the sequence of events, that Ms. Gray's companion was the one that pulled the gun, threatened the witness, and assaulted Ms. Gray. Sergeant Simonson, thinking that two aggravated assaults had happened, said, We really need her information so we can track this guy down. He tells Sergeant Sumner, Please get his information. Sergeant Sumner gets that information, calls back Deputy Barnett, and says, We need her information. We need to go ahead and detain her to get that information if necessary. So that's an order to Officer Barnett. That's correct. That's correct. Now, it turns out both sergeants Well, in good faith. I don't think the district court found to the contrary in terms of this was an honest mistake about who pulled the gun, right? Well, Your Honor, I don't think the district court considered it at all. If you read the district court's decision, the district court's decision is what Deputy Barnett did was wrong, therefore, what Sergeant Sumner and Sergeant Simonson did was wrong. Well, they ordered, you know, I mean, arguably ordered him to do it. I mean, I get the two S people a little bit. There's the person who directly ordered it. That was Sumner? Sumner. Correct, Your Honor. And, you know, so if he directly orders Barnett to do something, just hypothetically, that's unlawful. Even, you know, if he's just got a good faith mistake for reason for doing so, why isn't he culpable for that? Well, Your Honor, let's assume for a second that instructing Deputy Barnett, Simonson, Sumner, doesn't matter who, both of them, that that was somehow unlawful, violative of the Fourth Amendment. I think we've still got a problem, though. We don't have anything that tells us that that situation, the precise circumstances facing the two sergeants that day, is unlawful. Is it unlawful to advise a subordinate to briefly detain someone you believe to be a material witness to an aggravated assault involving a firearm simply for the purposes of obtaining information to try to find the suspect as quickly as possible? And this is why the second part of the Qualified Immunity Analysis at the district court level is so important. It is Ms. Gray's burden, her duty, to show that there was a sufficient body of law that told Sergeant Sumner and Sergeant Simonson on that day what they were doing was wrong. Now, if they say on the telephone, detain that witness by putting handcuffs on her, would that be illegal and clearly established? Your Honor, I think the degrees probably do matter. You can get lost in the granularity. You see this a lot in the shooting cases. Had Sergeant Sumner called Deputy Barnett and said, if she won't cooperate, just haze her, just shoot her? I think we're having a very different conversation. But to briefly stop somebody on the street to get some basic information to try to find whom they believe to be an armed suspect on the run is not unreasonable. In fact, there's no case law that says it's unreasonable. Well, I don't know how you can be making that argument for Sumner because it's at least a question of fact. Your Honor, that's a good question. I wrote that down when you asked my colleague, Ms. Russell. It's actually not a question of fact. And this is why the failure to respond to the summary judgment motion is so important. All of this was laid out in both of their motions for summary judgment. What question of fact are we talking about? About Sumner, and she was given the correct information by Barnett. Right. Your Honor, and she testified under oath that she misunderstood that. Why? We don't know. We know the conversation was extraordinarily short. Is there a record of her having the correct information? I'm sorry. Can you repeat that, Your Honor? Isn't there a record? Isn't there other evidence that shows she indeed had the correct information? No, Your Honor. Nothing. Well. Sergeant Sumner's versions of events is uncontroverted. She misunderstood what Deputy Barnett said. That is why she told Sergeant Simonson. There is no proof to the contrary, Your Honor. None. Oh. I, uh. Well, it's kind of agnostic about whether it was a mistake by Sumner on this. Correct. I think for the purposes of what we're talking about, Your Honor, that might be a little bit academic. But, Your Honor, there's no proof. Sergeant Sumner's version of events is uncontroverted. Really what the appellee is asking this court to do is make sort of this broad ruling that, under the circumstances presented to these two sergeants that day, that a law enforcement officer can never stop or briefly detain a witness to obtain information for any purpose. In fact. You keep saying briefly. There was enough going on over a long enough period of time to make it very clear that Ms. Gray did not want to provide the information that he was seeking. So then you get to the question whether she was obliged to do so and could be detained for not doing so. I see my time is up. May I answer Your Honor's question? I think that's the danger of this case here, and I think that's what the district court did wrong down below, is we looked at the totality of the circumstances as they actually unfolded. With the benefit of 20-20 hindsight, we apply all those facts to the two sergeants. We impute everything that Deputy Barnett knew to the sergeants. They knew almost nothing about it. They were simply trying to get to the fastest way possible to find an armed suspect. In your recollection, what were the terms of Sumner's order? How did she put it? Your Honor, and I don't want to speak. We can look it up. I read the deposition last night. She said something along the lines of, we really need to obtain her information. You may have to detain her if necessary. Something in that vein. Yeah. Okay. Okay. Any further questions? It's okay if you do. Didn't she say, didn't she file a report that said that the complainant pulled the gun? Your Honor, an excellent question. I know we're Your Honor's drawing this information about a potential fact issue. In response to Sergeant Sumner's statement of undisputed material facts, where Sergeant Sumner said, I misunderstood Deputy Barnett. I told Sergeant Simonson the wrong information. Ms. Gray attached what purported to be a summary of a BPSI, the Internal Affairs Investigation interview with Sergeant Sumner, which allegedly has her saying the exact opposite. First of all, it's not properly in the record. It wasn't cited properly. There was no foundation. It doesn't exist. But to the extent it does exist, Your Honor, it doesn't say what Ms. Gray says it says. I'm sorry, what? It doesn't say what Ms. Gray claims it does. That statement was given after all of the events had unfolded weeks later when everybody knew what the right answer was. So, yes, she gave the correct version of events at that time because she knew it at that time. But she didn't know it at the time. I mean, was this attached as an exhibit to something? It was a document, Your Honor, one of two ways. How is it not part of the record if they're citing it? I mean, unless they didn't attach it to something. Your Honor, I'm fine if it's a part of the record. I'm asking if it is part of the record. It was produced in response to a request for production of documents. Was it submitted in a filing to the court? Other than Ms. Gray's counterstatement of facts, no. Well, was it submitted as part of that counterstatement? It was. It was attached to the back of it. It's part of the record, right? I mean, you can argue that it's a worthless document, but it is part of the record, it sounds like. I would submit there needs to be foundation for it, that we can't just attach documents to things and say they're part of the record. Your Honor may disagree. You're talking about whether it's admissible at trial, perhaps, or something. Okay. Any other questions? Thank you. All right. Thank you for your time. I hear from Mr. Timmons. Good morning, Your Honors, and may it please the Court. Good morning. My name is Bryce Timmons, and I represent the appellee, Keisha Gray, along with my co-counsel, Melissa Stewart. Keisha Gray was a pregnant woman walking down the corridor, minding her own business near her house. Deputy Barnett, investigating a 911 call perfectly legitimately, approached her, pulled up next to her, and asked her about this allegation of domestic abuse. Was this in the middle of the day or the night? Middle of the day. Okay. And I'd strongly suggest that the Court watch the video. One of the nice things about this case is that the whole thing is on video. Ms. Gray displays her arms front and back. She lifts her neck so that the deputy can see that she doesn't have any strangulation marks or bruising on her chin. She displays her face very clearly so he can see that she didn't have any bruising from being punched in the face. She doesn't make any statement. She does. She just says she doesn't want to say something. That's not accurate, Your Honor. What she clearly says is, I had a verbal altercation with my fiancé. This man came up, and he pulled a gun on us, and I then decided to send my fiancé on my way, and I walked home. I was not assaulted. There was no domestic violence. I just want to go home. He asked for her ID. She says, I don't have it on me. He then says, well, can you give me your identifying information? And she declines. She doesn't want a future, doesn't want to have any further contact with the police over this incident. She had clearly disproven these threats of aggravated assault by the time that Deputy Barnett disengages with her. And that was about a five-minute interaction. Well, I'm not so sure about that, but go ahead. Okay. But she had a voluntary five-minute interaction to allow Deputy Barnett to conduct his investigation. And then she went on her way. Deputy Barnett clearly frustrated in the video that she would not. He contacts Sergeant Sumner, his shift commander, who plainly tells him that's her right. She has the right to walk away. I think we know the fact. Okay. I mean, the big thing you have to come up with here is some case law, like specific cases that make clear the illegality, let's start with Barnett, of his actions. I mean, we could talk all day long in terms of sort of, you know, first principles or whatever, but you have to give us some case sites that make this clear. Your Honor, there's two cases that I'd like to most prominently rely on. The first is from this court, Jones v. City of O'Leary, which is 947 Fed Third 905. And this court held, not only are the rights identified above, and that is to say the right to be free from seizure without reasonable suspicion, that the individual being seized has committed a crime. The quote is, not only are the rights identified above protected by the Constitution, but they are also quintessential examples of clearly established constitutional rights. Do you cite this in your brief? Your Honor, we became aware of this case after the brief was filed. I mean, are they aware? You can't argue stuff that you don't have in your brief. I'll move on. They're not in a position to respond. So, I mean, this is just an essential part of, you know, defeating qualified immunity is pointing to case law, usually that not only identifies the right at issue, but involves its application in somewhat similar facts. So, I mean, that's a challenge before you. I'll kind of let you go from there. Certainly, Your Honor. Well, I'd like to cite a case that they rely on. Brown v. Texas. This is a 1979 Supreme Court case that they quote directly from extensively in their brief. But what they don't tell the court is what the actual holding of Brown was. The court struck down a Texas stop and ID statute. I've put my notes away here. And the court specifically held that the reason the statute was being struck down is because it didn't contain the probable cause requirement. I apologize, Your Honor. I should not use technology. Are you reciting from Brown v. Texas? That's right, Your Honor. And I've got the direct quote here. The application of Texas Penal Code Title VIII, Section 38.2, which was the stop and ID statute, which is exactly the same thing that Deputy Barnett was trying to do here. To detain the appellant and require him to identify himself violated the Fourth Amendment because the officers lacked any reasonable suspicion to believe appellant was engaged or had engaged in criminal conduct. Accordingly, appellant may not be punished for refusing to identify himself. It's sort of challenging to understand how they rely so extensively on that case in their briefs without mentioning that it is about this precise type of crime. Well, it isn't really, right? I mean, this one starts with the report of a crime. That's not involved in the application of that Texas statute. Okay. Well, in that case, I'd like to address the cases that they rely on to argue that a report of a crime can permit a detention. They rely on two cases. This isn't about refuting exculpatory cases for that. You have to find cases that affirmatively show this is unlawful, just so you know. I understand, Your Honor. What I'm suggesting is that when we're talking about unlawful detention without reasonable suspicion that the person being seized has committed a crime, those broad first principles cases that the district court relied on are the right cases because these rights are so clearly established. I mean, you heard what I said before. It's usually not enough to invoke these settled first principles. Usually you need facts that are similar where we're applying those rights and saying, okay, this set of facts violates this specific right that now the officer should have known. Usually the officers, we don't demand that they be able to sort of intuit legal outcomes in their facts unless there are similar cases. I'm just being candid with you about what I see as the biggest difficulty you face. I understand that, Your Honor. I do stand by our position that when there's such a clear violation of such a clearly established right, the right to be free from arbitrary detention, that broad first principles cases are the right place to look. I mean, I think we do have some cases that say, I mean, the law, I don't know if there's sort of conflicting case law, but I think in our circuit we do have a case or two that says an officer can detain a material witness under certain circumstances. And if that's true, you have to find a case that says, well, not under these circumstances. You know, here's a case with certain circumstances. My circumstances are like that case's circumstances. All of the cases on which the appellant relies that say that you can detain a material witness under certain circumstances, the cases are Lincoln and Lidster. They address brief investigative stops. And in both of those cases, the thing that tipped the balance was a loss of human life. There was a hit-and-run car accident that resulted in a vehicular homicide, and there was a shooting by a police officer. Only in those cases is there this deviation from the standard rule that you must have reasonable suspicion that the person being detained has committed a crime. And in both of those cases, it was the loss of human life that permitted brief detention. Does it matter how long the person is detained? I would certainly think so, Your Honor. How long were we talking about here? In this case, our client, Ms. Gray, had stopped and engaged with the police officer voluntarily for about five minutes. Then, after a deliberative process where Sergeant Simonson, Sergeant Sumner, and Deputy Barnett all communicate about this, they make the decision to go aggressively and forcibly detain her, despite the fact that she was suspected of no crime and had already answered their questions with the sole exception of providing her identifying information. And how much time has elapsed all the time from the time that she was stopped and talked to and she was grabbed by the arm and all this? The initial contact, the voluntary lawful contact with Deputy Barnett, lasted about five minutes. There's a period of approximately ten minutes, during which time Deputy Barnett communicates with Sergeant Simonson, Sergeant Simonson communicates with Sergeant Sumner, and the instruction to detain her comes back down. Deputy Barnett then goes to where he believes he's going to encounter her, drives to that location, calls for backup, and says specifically, I'm going to have to fight this lady to get her information. He made an explicit conscious decision to use force, if he deemed it necessary, even before he went and re-engaged with her. He comes up to her and then detains her again for... Well, at that point, he detained her long enough to take her to jail, because she did try to pull away from him. We concede that Tennessee's resisting arrest statute requires people to submit, theoretically, to unlawful arrests. We don't concede that that's constitutional on its face. But she steps out in the street. At this point, the crime that she is alleged to have committed is obstructing a highway or passageway. She's alleged to have committed jaywalking. At that point, he proceeds to tackle her to the ground and handcuff her. That detention then lasts for another, I want to say, 18 hours. But the initial detention, the initial stop lasted approximately five minutes, and then the entire incident from the time that Barnett put her into the car probably lasted about 25 minutes. What do you say is the excessive force? Would I say this is excessive force? Yeah, I'm moving to the excessive force claim. As the district court found, excessive force is a balancing test, but here it's a bright line. If there is no reasonable suspicion that she committed any crime, the appropriate amount of force to use is none. Are you sure that's the law? I thought that when you judge it, you're dealing with an excessive force claim, separate and apart, the way you describe it, it really just merges into false arrest. But if you're talking about excessive force, the question is, I think, whether there was excessive force used to make the arrest, whether it was false or not. The district court's distinction below, which we agree with, is that the false arrest itself occurred the moment that he touched her and pulled his handcuffs out. The district court distinguishes the excessive force claim by saying that because he had no legal basis to detain her at all, that he could not employ any force for the detention, none whatsoever. And we agree that the district court is correct in that regard. Your Honor, I have a... Can you tell me what case you're relying on to say that basically if you have a false arrest, you have an excessive force claim? Your Honor, I don't have the case that the district court cited below right in front of me. Well, but do you have authority for that? Only what's cited in our briefs, Your Honor, and I don't have that case directly in front of me in my notes. There are some cases that talk about de minimis violations. Are we talking about some serious injuries to this lady, or is she just talking about she didn't like the officer grabbing her elbow or arm or whatever it was and letting her go? Your Honor, as the district court noted at the beginning of its order, she ultimately miscarried her child. This was not merely a minor violation of her person. I do want to address something else that the... Appellate's briefs, there is a suggestion that Detective Sumner did not know or didn't... that he just made some sort of a suggestion that she be detained, that he didn't give a clear instruction. Deputy Barnett testified, and this is in the record at 109-2, page ID 1068. Question, if you hadn't received an order to detain Ms. Gray, what would you have done next? Answer, I would have left. Question, so this whole encounter wouldn't have happened if you hadn't received orders to detain Ms. Gray. Answer, a second encounter? Correct. Sergeant Sumner then testified, and this is at 109-3, page ID 1074. Question, all right, what did Sergeant Simonson go on to say? Answer, he said to detain her for further investigative purposes. She was the victim of a DV, a witness to an aggravated assault on Mr. Hodge, and having her knowing or the knowledge at the time was that the male was armed, so to detain her for further investigation and identification of herself and whoever it was that she knew it was at the time was armed. So she had the information for the investigation. It was a sort of flustered answer, but she made very clear that all of this happened, this chain of causation began with Sergeant Simonson's instruction to her. She passed that order along. She passed that order along. The appellant suggests that that makes her merely a conduit. She's the shift supervisor, and reducing the role of a shift supervisor to that of a police radio we contend would be improper. There's a chain of causation from the very beginning. Simonson, then Sumner, and then Barnett, who says clearly he would not have done it. He wouldn't have even had that second encounter. Well, I mean, Mr. Greer makes the point that Sumner orders, I mean that's common ground, Barnett to detain her. And Sumner has reason to believe certainly that she's a material witness to a domestic assault. Now, whether she's a material witness as well to an aggravated assault with a firearm, you know, he makes or she makes a mistake, I guess, Sumner does. But, I mean, what's the case that says, what's the case that makes clear that it's unlawful for a more senior officer to order an officer on the street to detain a material witness? That's basically what she did here. The case that we'd rely on is that, let me find it here. I mean, this is sort of the blocking and tackling of qualified immunity. There is a case on point that Sheehy v. Luttrell cited in their briefs, 199 Fed Third 295, makes clear that a supervisor's mere encouragement to take an unlawful action creates that supervisory liability. And that's a quote from the case, the term encouragement. Let's say that, I mean, I'd have to look back at the record, but if she said something to the effect of detain this person because this person's a material witness, what's unlawful about that? Well, ordering someone detained without reasonable suspicion. Tennessee's a... I mean, we have this Gurbitz case from 1989. Material witnesses are subject to arrest and detention under appropriate circumstances. Tennessee has a material witness statute that addresses this, and it does not vest that power in police officers at all. I mean, I don't think you're going to make a 1983 claim with a Tennessee statute. You have to show a violation of the Fourth Amendment. So if we're just talking about the Fourth Amendment, this says under appropriate circumstances you can arrest material witnesses, which means you can order them detained if you're Sergeant Sumner. Now, maybe this was unlawful, but you have to give us a case that shows clearly it's unlawful. I mean, the district court offered one or two pretty brief analysis, and we'll take a very careful look at that. But this is, you know, in my view, this is what the case turns on right now. What are the cases? Well, Your Honor, what I would say is that, again, the analysis, this granular fact-specific analysis, those cases are typically excessive force cases. When we're talking about false arrest and detention, the broad principle cases, the broad Fourth Amendment cases are the ones that apply. And Sergeant Simonson, Sergeant Sumner, and Deputy Barnett in the record at 858, 1067, and 822 all agreed that they lacked reasonable suspicion to detain her and that they understood that they needed reasonable suspicion to detain a suspect. Okay, that's a fair point. And how do you deal specifically with Simonson's, the fact that he apparently was told that it was her assailant who had the gun? To the extent that he was told that, and that, I'm sorry, my time has expired. May I continue? Oh, of course, yeah. To the extent that he was told that, first, it is a question of fact because that's one thing we don't have on the video. It's the only part of the interaction we don't have on the video. But second, at no point in time did anyone ever believe that Keisha Gray had a gun. She was not suspected of having a firearm or having engaged in any unlawful activity. Thank you. Okay, thank you, sir. Thank you, Your Honor. I guess we'll hear a rebuttal. Are you each doing a rebuttal? No, no, I'll take care of the whole thing. Okay. If I'm not mistaken, the whole two minutes. All right. That's all right. Your Honor, just two brief points. And I think the panel's questioning to Mr. Timmons was apropos. We are looking, not we, Ms. Gray is looking at this case too generally. She's really relying on a couple of things. One, that the Fourth Amendment prescribes searches and seizures, unreasonable searches and seizures, and there's no probable cause or reasonable suspicion to believe that she had committed a crime. But Ms. Gray fails to acknowledge that there are instances where the police interact with general public where it's for a purpose other than the classic custodial arrest or Terry situation. But don't those cases, don't the Supreme Court cases make clear that the witness has a right to walk away? I don't know if the cases that we specifically spoke about in our brief necessarily evidence that, Your Honor. The point is Ms. Gray had cited the fact that we brought up the Brown versus Texas case in our brief. We weren't citing it for the ultimate holding of the case. We are citing it for the fact that Brown announced a balancing test that the Supreme Court has used for nearly 50 years for how to deal with situations that don't fit neatly into these buckets. The Fourth Amendment does not ban all searches and seizures. It just bans unreasonable searches and seizures. And as Your Honors have seen from the briefs and from today, there is no case law on point that says what Deputy Barnett, Sergeant Sumner, and Sergeant Simonson did was clearly wrong. I guess what they're saying is that the case law says categorically that an officer cannot detain a person without reasonable suspicion at least that that person, you know, detained like arrest, try to arrest, not just talk to. Hey, ma'am, could you stop for a moment? Like, you know, you can't do that without, you can't try to arrest somebody without reasonable suspicion that she has committed a crime. That's, I mean, if it's a categorical rule, then I guess they don't need a specific case saying, you know, you follow. So, I mean, what's your response? Is that just not the law? The situation matters. No, we obviously disagree with that, Your Honor. But the situation matters. The context matters. And this is why do we- Well, let me, on that legal proposition, I mean, do you have a sense as we're talking here whether that's a correct proposition? I mean, the Supreme Court's line of cases that deal with checkpoints, Lidster, some of the others are- That's not trying to arrest somebody. You're trying to arrest somebody. Can you do that without reasonable suspicion? Well, you're speaking from the perspective of a Fourth Amendment inquiry, Your Honor. The Supreme Court looked at those and said those are seizures under the Fourth Amendment. Right. We're ascribing particular terms of art to it, which is probably a little bit inaccurate. Certainly there are situations where law enforcement can seize individuals where there's no, you know, specific articulable suspicion that that particular person has committed a crime. I think those cases stand for that proposition. I mean, do any come to mind here? It's not your obligation, but, you know, if you have a case, that's helpful. Your Honor, I apologize. These are in our brief. Illinois v. Lidster, Brown v. Texas, and there's a couple others. Let's play this out. She refused to identify herself. They said she could be arrested for that. So they arrest her. She's done nothing else. How long can she be held? Your Honor, again, this is where I think the nuance of the case matters. Deputy Barnett was not directed to arrest her. It was to briefly stop her to obtain information. Now, we all know it turned into something else. We do. I'm sorry, counsel. He already had those interactions. She already spoke to him, and she already declined to give her identification. The only thing that this was about was her identification, right? That's why they insisted. And he made clear that he was going to have to fight with her or whatever. So let's say that she, you know, basically all she did was curse at him at that point. They take her in. What? I mean, how long can somebody who didn't commit a crime be held for identification? Your Honor, that's an important question. Obviously, the timing of those things matters. I'm sorry. I see my time is again up. May I finish the question? The timing certainly matters. You know, we have lines of cases that talk about whether two hours is unreasonable, whether 30 minutes is unreasonable. Whatever's going on is this person's being coerced into giving the information, right? Correct. I would submit that a very brief period of time would satisfy the constitutional requirements. A few minutes for something like this, Your Honor. So you get in the car. They drive you downtown. They say, we want your identification. You say, I told him I'm not giving you my identification. I didn't do anything wrong. The initial purpose of the interaction, Your Honor, was simply to run her information through the AFIS system that's in the squad car to locate her residence because it was presumed that her companion, I don't want to use the word suspect, but the other individual resided at that location. It was to try to locate him. So it wasn't as if there was never any intent to throw her in a car and drive her downtown and lock her up over the weekend. The real intent at the beginning of this was just to get some basic information. It wasn't to hold her for a long period of time. That was never the intent. Okay. Okay. Thank you, Your Honor. Thank you all for your arguments. The case will be submitted. The clerk may call the next case.